IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 23, 2012 Session

# STATE OF TENNESSEE v. MATTHEW JAMES CHAKALES

**Appeal from the Criminal Court for Knox County**
**No. 98240   Mary Beth Leibowitz, Judge**

**No. E2012-00638-CCA-R3-CD - Filed January 22, 2013**

The Defendant, Matthew James Chakales, pleaded guilty to aggravated burglary, a Class C felony, two counts of robbery, Class C felonies, and two counts of attempt to commit robbery, Class D felonies. See T.C.A.§§ 39-14-403, 39-13-401 (2010). The trial court sentenced the Defendant as a Range I, standard offender to an effective five years on probation. On appeal, the Defendant contends that the trial court erred (1) by reconsidering its previous grant of judicial diversion and (2) by revoking its previous grant of judicial diversion. Because the trial court erroneously reconsidered its previous grant of judicial diversion, we reverse the judgments of the trial court, reinstate judicial diversion, and remand for a probation revocation hearing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed;**
**Case Remanded**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which THOMAS T. WOODALL and D. KELLY THOMAS, JR., JJ., joined.

Mark E. Stephens, District Public Defender, Patrick Leonard, Assistant Public Defender; James K. Scott; and Darren V. Berg and Brett D. Stokes (on appeal), Knoxville, Tennessee, for the appellant, Matthew James Chakales.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Zane M. Scarlett, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

This case relates to the burglary of the Defendant's estranged wife's home, two robberies and two attempts to commit robbery of four local pharmacies. Although a transcript of the guilty plea was not included in the appellate record, trial court minutes show that the Defendant pleaded guilty by information to aggravated robbery, two counts of robbery, and two counts of attempted robbery and received an effective five-year sentence. The Defendant sought judicial diversion.

With regard to the aggravated burglary offense, the victim addressed the court at the judicial diversion hearing and stated that her primary concern was her and her children's safety from the Defendant. She provided the court with a history leading to the instant offense. She said that she and the Defendant had been separated for about nine months at the time of the offense and that the Defendant's behavior scared her. She said that she had recorded over fifty instances in which the Defendant threatened, stalked, or harassed her. She said she filed multiple police reports and obtained an order of protection approximately five months before the offense because the Defendant threatened to kill her and her parents if she sought a divorce. She said the Defendant violated the order of protection multiple times by showing up at her dentist's office and her place of employment and traveling to Wisconsin to see her while she was on a business trip. She said she did not report the violations because she wanted the Defendant to obtain help for his drug and alcohol addictions.

The victim stated that two months before the offense, the Defendant entered a rehabilitation facility and received treatment for forty-five days. She said the Defendant "abandoned" the program and stalked her by going to her at her place of employment. She said that on the weekend the offense occurred, the Defendant "broke down" her apartment door, although she and her children were not home. She said she and her children spent the weekend traveling from place to place to be safe from the Defendant.

The victim requested that the court require the Defendant to comply with the order of protection and with the court-ordered parenting plan. She requested that the Defendant's probation officer advise her "of any freedoms" the Defendant received, including his departure from the halfway house, in order to protect her children. She stated that if the Defendant complied with the order of protection and parenting plan, stayed drug and alcohol free, and complied with the other probation conditions, she did not oppose judicial diversion. She said the ability to expunge his record might provide the Defendant with an incentive to complete his probation successfully.

With regard to the robberies and attempted robberies of the four pharmacies, no witnesses were presented. The prosecutor, though, told the trial court that these events occurred in March and September 2011 and involved four different Walgreens locations. The prosecutor said the victims "suffered the fear of a traumatic experience at the hands of a man who is now asking this Court to forgive . . . and forget." We note that no additional information about the nature and circumstances of these offenses is included in the appellate record. We note, too, that the presentence report is not included in the appellate record.

The Defendant addressed the court and stated that he did not know if he deserved diversion but that he would "make the most of it." He apologized for his actions and said he was a selfish person. He admitted that he was an addict and that he put himself before his wife and children, his job, his community, and his church. He apologized to his wife and his children. He said that if the court granted his request for diversion, he would "contribute back to the community, to work hard, [and] to pay . . . child support." He stated that he would comply with all his wife's conditions and work to earn joint custody of his children. When asked if the Defendant realized how much fear he created for his children and the people he robbed and attempted to rob, the Defendant stated,

> [W]hen I first got to jail I sat in my cell a lot and cried, . . . poor me, like I was the victim. And I've come to realize the last 100 days . . . I did scare those people. They were just there to do their job, to earn a paycheck and go home and feed their families, and I can't imagine how much I scared them . . . asking for those without a prescription. . . . And for that I'm deeply regretful.

He admitted drinking alcohol since he was twenty years old and said he was thirty-six years old at the time of the hearing.

The trial court granted the Defendant's request for judicial diversion. The court stated that it granted his request because

> if you can make it and succeed then you've straightened it out. But you have terrorized, not just your children and your wife which was bad enough but people at Walgreens . . . and all those places. However, you're going to be on a strict rope because if you fail at diversion, you fail at probation in my view. And you . . . render yourself far too dangerous . . . not to go off to the penitentiary . . . faster than . . . a speeding bullet.

The trial court ordered that the Defendant have no contact with his wife or allow anyone to contact her on his behalf other than as provided in the order of protection and the parenting plan. The court stated that his violating the court orders also violated his

probation. The court ordered his completing Steps House, a halfway house program, and enhanced state probation. The probation officer addressed the court and stated the Defendant was required a wear a GPS monitor and was not allowed to enter any Walgreens or CVS pharmacy. The Defendant was released to the halfway house following the hearing.

The prosecutor told the trial court that it needed to prepare the judicial diversion contract, which required the parties' signatures. Because the Defendant was going to report to the halfway house that day, the court scheduled a court appearance three weeks later for the parties to sign the contract. Although the prosecutor stated that judicial diversion did not begin until the court signed the contract, the court instructed the prosecutor to state in the contract that the diversion began on the date of the hearing, December 14, 2011, and ended five years later on December 14, 2016.

On December 19, 2011, a violation of probation warrant was filed, alleging that the Defendant was discharged from his court-ordered halfway house on December 19. The Defendant moved to dismiss the probation violation and requested an amendment to his sentence due to a medical condition. In his motion, the Defendant contended that he was discharged from the halfway house because he needed surgery to his right hip, which occurred on December 21, and needed an identical surgery to his left hip. According to the medical records attached to the motion, on December 17, the Defendant presented to the emergency room with discomfort to his hip. The records show that the Defendant underwent "bilateral simultaneous total hip arthroplasty" on February 25, 2010. In June 2011, the hip replacements began to squeak, cause discomfort, and release cobalt and chromium into his blood. On December 21, Brian S. Edkin, M.D., performed a "revision arthroplasty" to the right hip, which required the Defendant to be hospitalized until December 28. Dr. Edkin concluded that the procedure was "necessary" and stated that he was "anxious" to perform the same procedure to the left hip within the next few weeks to months.

The next court appearance was February 29, 2012. The prosecutor told the trial court that because the probation violation warrant was filed before the judicial contract was signed by the parties, the Defendant had yet to be sentenced. The court agreed and said the probation violation warrant created a situation where there was a "null diversion or a revocation of diversion and a sentencing for diversion." The State requested that the court deny judicial diversion and sentence the Defendant to enhanced state probation. The court reconsidered its previous grant of diversion and held a sentencing hearing.

At the sentencing hearing, Tara Gray testified that she was the Defendant's probation officer and that she was unable to meet with the Defendant at his first appointment because of her schedule. She said that the Defendant met with another officer who placed a GPS device on the Defendant's leg. She said that the Defendant complained that the device was

-4-

too tight and that the probation officer had the supervisor verify that the device was not too tight. She said that after the GPS device was installed, the Defendant returned to the halfway house. She received a telephone call the next morning around 6:30 from Becky Nolan, an employee at the halfway house, who said the Defendant fell on some steps and was taken to the emergency room. She said Ms. Nolan told her that before the Defendant fell, he complained that he could not sleep on the sofa and could not work because of a medical condition related to his hips. She said that the program required the participants to work and that neither she nor the halfway house staff knew of the Defendant's medical condition. She said the halfway house discharged the Defendant because he could not complete the program. She denied the Defendant was discharged because he fell and was injured. She said the Defendant violated a condition of his probation by not being forthcoming about his medical condition.

Ms. Gray testified that the Defendant called her when he found out he was being admitted to the hospital. She said the Defendant had two problems with her being his probation officer. She said that the Defendant spoke to one of her probationers while in jail and that the Defendant became convinced she "was out to get him." She said the Defendant was upset that she supervised sex offenders, although all enhanced probation officers supervised sex offenders. She said that the Defendant misunderstands the difference between the enhanced probation unit and the enhanced probation sex offender unit and that he thought he had been classified as a sex offender.

On cross-examination, Ms. Gray testified that she was not present when the staff at the halfway house asked the Defendant about his medical history and said that she had no personal knowledge of their asking the Defendant about his previous hip replacements. She stated that an initial intake interview was not conducted when the Defendant came to her office for the GPS device. She said she received a telephone call from the halfway house after the staff called an ambulance. She denied objecting to the Defendant's being taken to the hospital after he fell. She agreed that the GPS device showed the Defendant was in the hospital, that she authorized the Defendant's hospital stay, and that she did not know the severity of the Defendant's condition. She stated that the Defendant told her he needed two surgeries, which she verified with the physician and nurse. She agreed she questioned the physician "in great detail" about whether the surgeries were medically necessary. She agreed the physician stated that the surgeries were both necessary and appropriate. She said that the Defendant could no longer participate in the halfway house and that it would take about sixty days for him to be admitted into another halfway house program.

The State argued against the Defendant's receiving judicial diversion. Defense counsel told the court that the jail did not "want" the Defendant because of his medical condition and wanted him furloughed. He stated that the sentencing hearing came as a

-5-

surprise because the Defendant received diversion two months previously and that he thought the court was holding a revocation hearing. He argued that the Defendant lacked a criminal intent and mens rea to violate the conditions of his probation. He also argued that the Defendant's hospital stay was a medical necessity and that Ms. Gray authorized his medically necessary surgeries.

Upon this evidence and courtroom discussion, the trial court stated that previously it said it "would place [the Defendant] on judicial diversion prior to all of these instances . . . but that never actually happened." The court stated that it placed the Defendant on judicial diversion so that he could work and support his family. The court noted that now the Defendant might be unable to work and that he had "some medical conditions that were not reflected in the original presentence report." The court noted that the original presentence report showed that the Defendant underwent treatment for his addictions two or three times previously, most recently in October 2011. The court said that the Defendant complained about "absolutely everything" while at the halfway house and that it was "very obvious . . . that [the Defendant was] a manipulative individual who want[ed] to be in control – and you are not; I am – of your life."

The trial court stated that the Defendant had "a terrible drug problem" but noted that he had "probably been clean" for the previous sixty days while in confinement. The court found that the Defendant did not hesitate to "point guns – or whatever he did to rob people at pharmacies, to terrorize his family." The court found that the Defendant complained about whether his probation officer supervised sex offenders, about his GPS device, and about the halfway house program. The court found that the Defendant knew about his medical condition. The court stated,

> I have been really disturbed about the decision that I made because I think [the Defendant] . . . has an ongoing issue, that he had no hesitation to do not one, not two, but four attempts or robberies of pharmacies . . . and an aggravated burglary. And his behavior toward his family, including his children, really frightens me and for good reason, and I guess it frightened everybody else that's involved.

The court refused to grant the Defendant's request for judicial diversion and sentenced him to five years' probation. The court said that it thought it "made a mistake before, and this [wa]s going to give [the court] the opportunity to change that." This appeal followed.

# I

The Defendant contends that the trial court erred by reconsidering its previous grant of judicial diversion and conducting a sentencing hearing. The State concedes that the trial court erred when it conducted a sentencing hearing rather than a probation violation hearing. We agree that the court erred by reconsidering its grant of diversion and holding a sentencing hearing.

The December 14, 2011 trial court minutes state, "By order of the court the defendant is hereby placed on Judicial Diversion and a written order is entered as to this case. By the authority of T.C.A. 40-35-313, judgment is hereby reserved until December 14, 2016." The minute entry was signed by the trial judge. In State v. Byington, 284 S.W.3d 220, 225 (Tenn. 2009), our supreme court discussed the importance and reliability of court minutes as a record of the proceedings occurring in the trial court. The court stated that "the court minutes are 'the highest evidence of what is done in the court, and, so far as they are records of judicial proceedings, import absolutely verity, and are conclusive unless attacked for fraud.'" Id. at 225-26 (quoting Dyer v. State, 79 Tenn. 509, 514 (Tenn. 1883)). "The rule . . . is[] that 'minutes' are indigenous to Courts of record; and when they are signed by a Judge, they become the highest evidence of what has been done in the Court." Howard v. State, 399 S.W.2d 738, 740 (Tenn. 1996). We conclude that the trial court placed the Defendant on judicial diversion on December 14, 2011, which became effective that day. The court erroneously held a sentencing hearing and should have conducted a violation of probation hearing pursuant to the probation violation warrant filed on December 19, 2011.

# II

The Defendant contends that the trial court erred by revoking its grant of judicial diversion based on his discharge from the court-ordered halfway house. He argues the basis for revoking his diversion was caused by a medical emergency. The State contends that because the trial court erred by reconsidering its previous grant of diversion and conducting a sentencing hearing, this court should remand the case for a probation revocation hearing. Because the trial court did not make the appropriate findings of fact and conclusions of law with regard to the alleged probation violation, we conclude that the case must be remanded for a probation revocation hearing.

A trial court may revoke probation upon its finding by a preponderance of the evidence that a violation of the conditions of probation has occurred. T.C.A. § 40-35-311(e) (2010). The probation violation warrant alleged that the Defendant violated rule ten of the conditions of probation in that he "was discharged from his Court ordered halfway house on 12/19/11." Ms. Gray testified that the Defendant was discharged because he could not

complete the program, not because he fell and required hospitalization. Although there was no evidence that Ms. Gray or any probation officer performed an initial intake interview of the Defendant or whether the staff at the halfway house asked the Defendant about any medical conditions that would interfere with his ability to complete the program, Ms. Gray concluded that the Defendant was not forthcoming about his medical condition. The trial court found that the Defendant's medical condition was not included in the presentence report.

The trial court's findings were limited to whether it should grant the Defendant's request for judicial diversion. The record fails to show that the court considered or found whether the Defendant violated the conditions of his probation by a preponderance of the evidence. The court did not address whether the Defendant's being discharged from the halfway house was due to his inability to complete the program because of a medical condition, his failure to disclose his medical condition, or his alleged excessive complaining. We must remand for a probation revocation hearing.

In consideration of the foregoing and the record as a whole, we reverse the judgments of the trial court, reinstate judicial diversion, and remand for a probation revocation hearing.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE